IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

No.  24-11027

———————————————

JAMIE KENNEDY, Plaintiff-Appellant,

vs.

LLOYD J. AUSTIN III, in his official capacity
as Secretary of the Department of Defense,
Defendant-Appellee.

———————————————

APPEAL FROM A FINAL JUDGMENT
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

———————————————

**BRIEF OF APPELLANT**

———————————————

Scott G. Reddock
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
912.332.7077
reddgeg@aol.com
Attorney for Plaintiff-Appellant

Katie R. Bates
Bates Law Group, LLC
Georgia Bar No. 106088
111 West Court St.
Hinesville, GA 31313
912.332.7077
krb@bateslawgroup.com
Attorney for Plaintiff-Appellant

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

JAMIE KENNEDY,             )
                                    )
            Appellant,    )
                                    )   No. 24-11027
vs.                          )
                                    )
LLOYD J. AUSTIN III, in his    )
official capacity as Secretary of    )
the Department of Defense       )
                                    )
            Appellee.    )

## **CERTIFICATE OF INTERESTED PERSONS**

COMES NOW appellant Jamie Kennedy, and files her certificate of interested persons pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1. The following is a complete list of all persons and entities known to have an interest in the outcome of this particular case or appeal:

Baker, Hon. R. Stan

Bates, Katie R.

Bates Law Group, LLC

Department of Defense

i

Kennedy, Jamie

Patrick, Bradford Collins

Ray, Hon. Christopher L.

Reddock, Scott G.

Scott G. Reddock Attorney at Law, LLC

Secretary of Defense

Steinberg, Jill E.

Stuchell, James C.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted this 5th day of September, 2024.

/s/ Scott G. Reddock
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
912.332.7077
reddgeg@aol.com
Attorney for Appellant

## **TABLE OF CONTENTS**

**CERTIFICATE OF INTERESTED PERSONS** . . . . . . . . . . . . . . . . . . i

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

**STATEMENT REGARDING ORAL ARGUMENT** . . . . . . . . . . . . . . . . . . . .vii

**JURISDICTIONAL STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

**STATEMENT OF ISSUES ON APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1. Course of proceedings and disposition in the court below . . . . . . . . . . . . . . . . 2

2. Statement of the facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      a.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      b.  Atmosphere of Racial Animosity and Tension at the
          Commissary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      c.  History of Harassment of Kennedy by Redman Prior
          to December 16, 2020 Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      d.  Incident of December 16, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

e.  Initial Investigation of the Incident . . . . . . . . . . . . . . . . . . . . . . . . 12

f.  No-Contact Order Imposed on Kennedy/Shift Change . . . . . . . . . . 13

g.  Notice of Proposed Suspension . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3. Statement of the standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**ARGUMENT AND CITATION TO AUTHORITY** . . . . . . . . . . . . . . . . . . . . 20

I.  The District Court erred in its analysis of Kennedy's "convincing mosaic" argument when it neglected to consider the allegations related to the December 16, 2020, incident and the differing treatments of Kennedy and Redman in the aftermath despite recorded exculpatory evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.  The District Court erred by misapplying the "convincing mosaic" analysis when it conducted only a piecemeal analysis of the allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iv

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Baines v. City of Atlanta, Georgia*, 2020 WL 10058116 (N.D. Ga. March 10, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . 17

*Castillo v. Allegro Resort Mktg.*, 603 F. App'x. 913 (11th Cir. 2015) . . . . . . . . 16,17

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) . . . . . . . . . . . . . . . . . 20

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019) . . . . . . . . . .18, 20-23

*Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729 (7th Cir. 2011) . . . . . . .21

*Skinner v. Switzer*, 562 U.S. 521 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Tynes v. Fla. Dep't of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023) . . . . . . . . 21

**Statutes**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Other**

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests an opportunity to present oral argument on the issues in this appeal. This case involves important issues concerning the application of the "convincing mosaic" analysis in a Title VII racial discrimination claim and lower courts may benefit from clarification on these issues. The Plaintiff-Appellant's assertion that she met her pleading burden under the "convincing mosaic" standard, as it depends on the compilation of many disparate facts alleged in the Complaint, would be supplemented and aided by an oral articulation of these arguments and factual allegations.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

Jurisdiction is proper in this case under 28 U.S.C. § 1331, as this appeal arises from a judgment dismissing a civil action in the United States District Court for the Southern District of Georgia, alleging violations of Title VII, 42 U.S.C. § 2000e *et seq*.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. The District Court entered a final judgment granting the Secretary's Motion to Dismiss on February 5, 2024.  Doc. 56[1]  A notice of appeal was timely filed on April 2, 2024.  Doc. 57.

## STATEMENT OF ISSUES ON APPEAL

(1) Whether the District Court erred in omitting certain key factual allegations from its analysis of whether Kennedy had established a "convincing mosaic" of circumstantial evidence sufficient to raise an inference of racial discrimination;

(2) Whether the District Court erred when it analyzed those allegations offered by Kennedy in support of her "convincing mosaic" argument in a "piecemeal" fashion, rather than by considering all of the proffered allegations as a whole.

---

[1] Pursuant to 11th Cir. R. 28-5, references to the record in a brief must be to document number and page number.

1

## STATEMENT OF THE CASE

### 1. Course of proceedings and disposition in the court below.

Kennedy filed an informal complaint with the EEO on December 17, 2020, based on  claims of racial discrimination.  Doc. 45 ¶ 62. On February 1, 2021, Kennedy received a letter giving her leave to file a formal complaint  ("the EEO Complaint") which she did on February 9, 2021.  *Id.* ¶ 63.  On August 23, 2021, the DeCA director issued a Final Decision on the first EEO Complaint, denying Kennedy's claims for relief and opening the way for a Complaint to be filed in the federal district court of the Southern District of Georgia.  *Id.* ¶ 70.

Kennedy filed her initial complaint in the United States District Court for the Southern District of Georgia (Savannah Division) on November 21, 2021, docketed as 4:21-cv-00333.  After a period involving subsequent amendments to the complaint (not relevant to this Appeal), Kennedy filed a Third Amended Complaint on July 3, 2023 (Doc. 45) followed by the Secretary's Motion to Dismiss the Third Amended Complaint (Doc.  46), Kennedy's Response to the Secretary in Opposition to the Motion to Dismiss (Doc. 51), the Secretary's Reply to Kennedy's Response (Doc. 53), and finally the District Court's Order granting the Secretary's Motion to Dismiss (Doc. 54) from which order and Judgment (Doc. 56) Kennedy

filed a Notice of Appeal (Doc. 57).

## 2. <u>Statement of the facts.</u>

### a.  <u>Factual Background</u>

On or around May, 2019, Kennedy was hired as a cashier at the commissary on HunterArmy Airfield and was thereafter promoted to "Store Worker" on or around March 29, 2020.  Doc. 45, ¶ 6.  She held that position as of the date the Complaint was filed. Id.  Kennedy's rate of pay in this position at all times relevant to the Complaint was $18.29 per hour.  *Id.*  Kennedy worked twenty-four (24) hours a week in this position.  *Id.*  The Store Worker position is a WG (Wage Grade) 4 position.  Id.   Kennedy is Caucasian.  *Id.* ¶ 7.

At all times relevant hereto, Kennedy's first line supervisor was Vera Dunk ("Dunk"), whose position was that of Grocery Manager. Dunk is African-American.  *Id.* ¶  8.  At all times relevant hereto, Wade Broomfield ("Broomfield"), was Kennedy's second line supervisor.  *Id.* ¶  9. Broomfield's position was that of Deputy Store Manager. Broomfield is Caucasian.  *Id.*  From her hiring until sometime in the spring of 2021, Kennedy's third line supervisor was Marites Pennington ("Pennington"), whose position is/was that of Store Manager.  *Id.* ¶ 10.  Pennington is Filipina-American.  *Id.*  From sometime in the spring of

2021, and up to October 2022, Kennedy's third line supervisor was Jovelyn Rountree ("Rountree"), whose position was Store Manager. *Id.* ¶ 11. Rountree is African-American. *Id.* At all times relevant hereto, Pennington was Broomfield's first line supervisor. *Id.* ¶ 12. At all times relevant hereto, Ellistina Redman ("Redman"), was one of Kennedy's co-workers at the commissary, also holding the position of Store Worker. *Id.* ¶ 13. Redman is African-American. *Id.* ¶ 14.

### b. Atmosphere of Racial Animosity and Tension at the Commissary

On or about October 2019, while Kennedy was working as a cashier, Kennedy overheard Roshonda Chavis ("Chavis"), another cashier, use the word "nigga" twice in a conversation with others co-workers in at the front of the store (a customer-frequented area) during normal business hours. Chavis is African-American. *Id.* ¶ 15. Kennedy complained to her supervisor at the time, front end manager Hope Joseph ("Joseph"), about Chavis' use of the word, which Kennedy felt was inappropriate and unprofessional. Joseph in turn informed Broomfield, Kennedy's second line supervisor. *Id.* ¶ 16. The day following Kennedy's complaint to Joseph, she was called into a meeting with Broomfield, Joseph, and Chavis, during which Davis' use of the word was discussed. During said meeting, Chavis denied using the word. *Id.* ¶ 17. No further action was taken

4

to investigate the matter. *Id.* ¶ 18. Chavis did not receive counseling, reprimand, or discipline, formal or informal, regarding the matter and it was not pursued further. *Id.* ¶ 19.

On or about April 2020, Pennington, Kennedy's third line supervisor, commented to Kennedy: "I only married [my ex-husband] to get out of the Philippines. I don't even like white guys." This statement referred to Pennington's first husband, a Caucasian. *Id.* ¶ 20.

During the spring of 2020, Redman, a fellow Store Worker, made multiple comments to Kennedy expressing her displeasure when she learned that her son was marrying a white woman. Redman also informed Kennedy that when Redman's son was younger, she would not allow him to stay overnight with his white friends at their homes because she did not "trust white people to treat him well." *Id.* ¶ 21. Redman openly used the word "nigger" in the workplace on multiple occasions. *Id.* ¶ 22. On at least one occasion Redman bragged to Kennedy after using the word, "yeah, I said it," in response to Kennedy's visible discomfort at Redman's use of the word. *Id.*

### c.  History of Harassment of Kennedy by Redman Prior to December 16, 2020

Sometime around the beginning of July of 2020, Redman advised Kennedy to "stay away from" Cassidie Alexander, another employee, because Alexander was a "spy." *Id.* ¶ 23.  Alexander is Caucasian. Kennedy later relayed Redman's statements to Alexander. *Id.*  Based on this information, Alexander complained to Pennington that Redman was spreading rumors about her, and Pennington in turn addressed the matter with Redman. *Id.*  The next day, Redman approached Kennedy and said "You got messy," referring to Kennedy's decision to inform Alexander of Redman's comments. *Id.* ¶ 24.  Kennedy did not engage in further discussion with Redman at that time. *Id.*  A day or two later, while Redman and Kennedy were on break in a gazebo outside the Commissary, Redman called Kennedy a "motherfucking bitch," among other profanity. *Id.* ¶ 25.  Kennedy was taken aback by Redman's comments and left the area. *Id.* Because this was the first negative incident between Kennedy and Redman, and Kennedy believed the issue would "blow over," Kennedy did not report Redman's abusive language toward her. *Id.*

On July 16, 2020, Redman requested a meeting with Pennington,

Broomfield, and Kennedy to discuss the ongoing tension between Kennedy and

herself. *Id.* ¶ 26. At this meeting, Redman admitted to cursing at Kennedy in the

gazebo the week prior. *Id.* Redman also stated during this meeting, in effect: "If I

wanted to slap [Kennedy] like I wanted to, I could have, and [store management]

could not have held me accountable as I would have been on my break." *Id.* At

one point during this meeting, Pennington stepped out of the room, during which

time Redman told Broomfield that she believed Kennedy was racist. *Id.*

Broomfield objected to Redman's characterization, to which Redman stated in

response that Kennedy had told her that she, Kennedy, supported then-President

Donald Trump. *Id.* At no time did Kennedy discuss her political affiliations and/or

beliefs at work or express her political affiliations and/or beliefs via a public format

and therefore the same was not discoverable by co-workers. *Id.* ¶ 27.

Between July 16, 2020, and December 16, 2020, Redman would frequently

make eye contact with Kennedy and assume a physically intimidating posture

("bowing up") toward Kennedy when the two crossed paths during the workday.

*Id.* ¶ 28. During said time period Redman also physically blocked Kennedy's path

multiple times forcing Kennedy to divert her path to avoid Redman. *Id.* ¶ 29. In

another instance during this period, Kennedy had to ride in a motorized scooter at

work due to a back injury. Kennedy overheard Redman state to other employees

within Kennedy's hearing that Kennedy was "milking it." *Id.* ¶ 30. During said

time period, Redman began complaining to other employees within Kennedy's

hearing about Kennedy's work performance and keeping her work area clean. *Id.* ¶

31.

On August 12, 2020, Kennedy initiated an EEO complaint due to the

harassment by Redman, but later withdrew it out of fear of reprisal. *Id.* ¶ 32.

Kennedy complained about Redman's actions to Dunk three or four times between

July 16, 2020, and August 18, 2020, but as far as Kennedy is aware, Dunk took no

corrective action in response to these complaints. *Id.* ¶ 33. Kennedy began

directing her complaints to Dunk because of Pennington's unwillingness to take

any corrective action with Redman after the meeting on July 16, 2020. *Id.*

On or about August 18, 2020, approximately one month after the meeting

with Pennington and Broomfield, Kennedy complained to Dunk yet again about

what Kennedy believed was an ongoing course of harassment by Redman. *Id.* ¶ 34.

Dunk promised to address the issue with Redman. *Id.* Later that day, Dunk

confirmed to Kennedy that Dunk had spoken with Redman. *Id.* However,

Redman's harassment of Kennedy continued. *Id.* Redman has confirmed in a

sworn statement given during the later EEO investigation discussed infra that she

was aware of Kennedy's complaints to Dunk made prior to December 16, 2020. *Id.*

8

¶ 35.  At no time prior to December 16, 2020, did Redman report any instance

involving Kennedy acting aggressive, hostile, or making derogatory remarks

pertaining to Redman or any other employee.  *Id.* ¶ 36.


    <u>d. Incident of December 16, 2020</u>

On or about December 16, 2020, at approximately 11:00 A.M. Kennedy was

in the administration office filling out paperwork.  *Id.* ¶ 37.  Redman came up

behind Kennedy and in an assertive tone said "Nineteen!"  *Id.*  Initially Kennedy

believed Redman must be using her earbuds to speak to someone on the phone so

she did not respond.  *Id.*  Redman then stated "Nineteen, I need key nineteen, give

it to me!" in an overly aggressive tone and Kennedy realized that Redman was

speaking to her; Kennedy was caught off guard by Redman's tone and so Kennedy

did not respond verbally.  *Id.*  Kennedy held out her hand with the keys to Redman,

who snatched them out of Kennedy's hand.  *Id.*

Key Nineteen was the key to several doors in the warehouse, including the

receiving bay doors and the receiving office. Employees were required to keep the

receiving office locked if they had no work to do in the office.  *Id.* ¶ 38.  Kennedy

continued to print out the forms that she had filled out.  *Id.* ¶ 39.  She gathered up

the paperwork and made her way to the receiving office to complete her paperwork.

9

*Id.*  Kennedy knew that Redman would be in the warehouse area because Redman had asked for Key Nineteen, and that if Redman was not in the receiving office, that Kennedy would have to seek Redman out in order to get Key Nineteen back from Redman to unlock the receiving office.  *Id.*

Based on Redman's overtly hostile tone in their interaction a few moments before; Redman's prior comments to Broomfield and Pennington that if she wanted to "slap" Kennedy there was not anything management could do; and the months-long course of harassment from Redman, Kennedy decided to use her cell phone to record what she feared would be a potentially negative, if not violent, encounter with Redman.  *Id.* ¶ 40.  Kennedy's decision to record was made out of fear and the potential need to protect herself if necessary with some kind of objective evidence.  *Id.*  As Kennedy approached the receiving office, Redman was standing just inside the office doorway.  *Id.* ¶ 41.

As Kennedy attempted to walk around Redman to enter the receiving office, the following verbal exchange between Kennedy and Redman took place (hereinafter "the incident"):

10

Kennedy: Pardon me.

Redman: What the fuck did you just say to me?

Kennedy: I said pardon me. Pardon me.

Redman: Don't play with me Jamie, I try not to say nothing to you. You already know I can't stand you. Here's the keys. Don't do that. Go ahead and tell Vera because I don't care anymore.

Kennedy: I said pardon me.

Redman: No, you did not.

Kennedy: Yes I did. Then you should get your ears checked.

Redman: I don't need my fucking ears checked. But if you call me another nigger, it's gonna be me and you, okay?

Kennedy: What? Nobody said that.

Redman: That's what you exactly said.

Kennedy: No it is not. I've never called anybody that.

Redman: You just did.

Kennedy: Uh, no I didn't.

Redman: I'll make sure you pay for it. See if I don't do it. Telling you right now.  I don't appreciate that, honey.

(Redman leaves office).

*Id.*

During the incident Redman directly refers to Kennedy notifying Dunk of Redman's behavior before alleging that Kennedy used a racial slur. *Id.* ¶ 42. Following this incident, Kennedy was shaking and upset. *Id.* ¶ 43. In order to give herself time to calm down, Kennedy informed the meat manager, Mike Cobb ("Cobb"), that she needed to go to lunch. *Id.* After Kennedy returned from lunch, she informed Cobb of what had happened. *Id.* ¶ 44. Cobb informed Kennedy during that same conversation that Joseph and Redman had already come to him to report that Kennedy had called Redman a "nigger." *Id.* ¶ 45. Kennedy then produced the Recording on her phone and Cobb watched and listened to it. *Id.* Cobb agreed that he did not hear Kennedy use a racial slur on the Recording, told Kennedy that Kennedy "had nothing to worry about," and advised Kennedy not to delete the Recording. *Id.*

e. Initial Investigation of the Incident

Immediately after the incident, Redman reported to Joseph that Kennedy had called Redman a "nigger." Joseph then contacted the zone manager, Kenneth Murray ("Murray"), to inform him of the incident. Murray instructed Joseph to have anyone involved in the incident submit statements. Joseph also informed Pennington and Dunk about the incident. *Id.* ¶ 46. On December 17, 2020,

Kennedy was called into a meeting with Pennington and Dunk to discuss the incident. *Id.* ¶ 47. During the course of the meeting, Kennedy offered her phone toPennington and Dunk so that they could both view the Recording. However, they refused to view the Recording at that time. *Id.*

On December 18, 2020, Kennedy was again called into a meeting with Pennington and Dunk, who told Kennedy that Human Resources had instructed them to review the Recording. Pennington and Dunk both viewed the Recording at that time. Both stated later that they did not hear Kennedy call Redman a "nigger" in the Recording. During this same meeting, Pennington and Dunk accused Kennedy of harassing Redman. *Id.* ¶ 48.

A review of the Recording shows that Kennedy did in fact say "pardon me," and not "nigger." *Id.* ¶ 49. Despite reviewing the Recording, which showed Redman using profanity and acting aggressively toward Kennedy, including making threats, Pennington and Dunk nevertheless proceeded with disciplinary action against Kennedy and imposition of a "No-Contact" order. *Id.*

### f. No-Contact Order Imposed on Kennedy/Shift Change

Kennedy was issued a "No-Contact" order ("NCO") on December 22, 2020. *Id.* ¶ 50. The NCO order specified that Kennedy was to have no contact with

Redman.  In accordance with the NCO, Kennedy was taken off day shift and put on the evening shift.  *Id.*  No NCO was issued to Redman nor was she ever instructed to stay away from Kennedy.  *Id.* ¶ 51.  The immediate effect of the NCO at the time it was issued was that Kennedy was placed immediately on evening shift and had to cancel a family visit from out-of-town relatives over the Christmas holiday.  *Id.* ¶ 52.  Despite the Commissary's management's investigation having concluded upon issuance of the Notice of Proposed Suspension to Kennedy on February 26, 2021 (discussed infra), the NCO remained in place until October 2022.  *Id.* ¶ 53.

The NCO and shift reassignment remaining in place had the result of precluding employment opportunities for Kennedy, specifically around August/September 2021 when Kennedy wished to apply for a position in the meat department as a "Meat Cutting Worker," a day-shift position for which Kennedy was qualified.  *Id.* ¶ 54.  Kennedy received an open invitation from the head of the meat department to "detail" for this position prior to the official job opening being posted.  *Id.*  Kennedy inquired of Rountree whether she would be prevented from pursuing this position due to the NCO and shift reassignment, and was told by Rountree that the NCO and shift reassignment were still in place.  *Id.*  This position offered a pay rate of $19.07-$22.27 per hour, thirty-two (32) hours per week, and a promotion to WG 5.  *Id.*

14

g.  Notice of Proposed Suspension

Sometime between December 16, 2020, and February 26, 2021, Dunk consulted with Labor Management and Employee Relations Specialist DeAnda Glass ("Glass") as to how to proceed with disciplinary action against Kennedy. *Id.* ¶ 55.  Glass, for her part, was basing her advice to Dunk only on the information Dunk had provided to her, including Dunk's description of the contents of the Recording. *Id.*  Glass provided Dunk with a range of possible disciplinary actions for Kennedy, including written warning, letter of reprimand, or suspension. *Id.* ¶ 56.  Dunk decided on a seven day suspension, thereafter referring the proposed suspension to Pennington for final approval, which Pennington gave. *Id.* ¶ 57.  The Notice of Proposed Suspension was issued to Kennedy on February 26, 2021 ("Proposal"). *Id.* ¶ 58.  The Proposal sought a seven (7) day suspension for Kennedy. *Id.*

Three grounds were relied upon in support of the Proposal:

(1) that Kennedy had called Redman a "nigger" on December 16, 2020;

(2) that Kennedy had, in directing a racial slur at Redman, subjected Redman to race-based harassment;

(3) that Kennedy had violated DeCA policy by surreptitiously recording her interaction with Redman during the Incident.

15

*Id.* ¶ 59.

Following issuance of the Proposal, The American Federation of Government Employees Local 1922 ("the Union"), issued a written response to the Proposal on behalf of Kennedy. *Id.* ¶ 61. This written response included its own transcribed version of the Recording, substantially similar to the one provided *supra*. *Id.*

No official disciplinary action of any kind has ever been taken against Redman for her conduct during the Incident or for any of her prior harassing conduct toward Kennedy. *Id.* ¶ 76. In addition, a NCO was only ever issued to, and binding upon, Kennedy. *Id.* Finally, while Kennedy was forced to work the evening shift for almost two years, Redman remained on day shift. *Id.*

### 3. <u>Statement of the standard of review.</u>

The 11th Circuit Court of Appeals reviews a district court's ruling on a 12(b)(6) motion to dismiss for failure to state a claim de novo, applying the same standard as the district court. *Castillo v. Allegro Resort Mktg.*, 603 F. App'x. 913, 915 (11th Cir. 2015). To survive a 12(b)(6) motion to dismiss, the complaint must contain a "short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard is met when the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When determining whether a complaint meets this plausibility standard, the court must accept the facts in the complaint as true and must view them in the light most favorable to the plaintiff. See *Twombly*, 550 U.S. at 555; *Castillo*, 603 F. App'x. at 915.

The complaint does not need to contain "detailed factual allegations," but simply sufficient factual content to allow the court to draw a reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The plausibility standard does not "impose a probability requirement at the pleading stage," and a complaint may proceed even if the court suspects that uncovering actual proof of the pleaded facts is improbable and recovery is unlikely. *Twombly*, 550 U.S. at 556. Additionally, the complaint need not be a "model of the careful drafter's art" nor must it accurately detail a "precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Indeed, "Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted[, because] imposing a 'heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2).'" *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346

17

(2014) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002)); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245-46 (11th Cir. 2015) (finding that the District Court abused its discretion in failing to apply the *Iqbal/Twombly* plausibility standard to a Title VII race discrimination complaint).

## SUMMARY OF THE ARGUMENT

The District Court's decision should be reversed because its legal conclusion is based on an omission of certain crucial allegations from consideration in its assessment of the Plaintiff's "convincing mosaic" argument on her Title VII racial discrimination claim.  Specifically, the District Court did not consider the allegations related to the incident on December 16, 2020, between Kennedy (Caucasian) and Redman (African-American), or management's subsequent differing disciplinary treatment of each in light of recorded evidence of the incident.  As this Court observed in *Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019), in arguing under the "convincing mosaic" rubric, a Plaintiff can draw from "bits and pieces" of evidence from almost any source that, taken together, are sufficient to create an inference of discriminatory intent.  As was also noted by this Court in *Lewis*, a set of facts showing disparate treatment of employees that may, on the one hand, fail to establish a "similarly situated comparator," may nevertheless be useful in assessing a "convincing mosaic"

argument.

The District Court's decision should also be reversed because its legal conclusion contravenes binding case law from this Circuit setting out the cumulative nature of the "convincing mosaic" test in assessing the sufficiency of pleadings in a Title VII racial discrimination claim.  Again, in *Lewis*, this Court laid out the framework for applying the "convincing mosaic" analysis as potentially drawing evidence from multiple sources which, when taken together, is sufficient to create an inference of discrimination.  However, the District Court, to the extent it did analyze some of Kennedy's allegations, did not treat those allegations as a totality, but instead analyzed each separately as to whether each, by itself, was sufficient to create a "convincing mosaic."  In taking this approach, the District Court misapplied the "convincing mosaic" test.

For these reasons, this Court should reverse and vacate the District Court's decision and remand the case for further proceedings.

## ARGUMENT AND CITATION OF AUTHORITY

1 .    **The District Court erred in its analysis of Kennedy's "convincing mosaic" argument when it neglected to consider the allegations related to the December 16, 2020, incident and the differing treatments of Kennedy and Redman in the aftermath despite recorded exculpatory evidence.**

"To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees [comparator] outside her class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

However, "a *prima facie* case of disparate treatment does not always depend on the existence of a similarly situated comparator" and can be established by the "convincing mosaic" method. *Baines v. City of Atlanta, Georgia*, 2020 WL 10058116, at *6 (N.D. Ga. March 10, 2020). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . and other bits and pieces of from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d

20

1169 (11 Cir. 2019) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d

729, 734 (7th Cir. 2011).

As is clear from the holding in *Lewis*, the "convincing mosaic" analysis

can draw from almost any source in building a "mosaic" suggesting

discriminatory intent.  This is evident from the use of "evidence that

demonstrates, *among other things* . . . . *Id.*  (Emphasis added).  And also:

"suspicious timing, ambiguous statements . . . *and other bits and pieces* from

which an inference of discriminatory intent might be drawn . . . ."  *Id.* (Emphasis

added).

This Court reiterated the cobbling together of separate pieces of evidence

as a means of presenting a "convincing mosaic" more recently in its holding in

*Tynes v. Florida Department of Juvenile Justice* in stating that "[a] plaintiff

proving her case through the convincing mosaic standard may point to any

relevant and admissible evidence."  *Tynes v. Fla. Dep't of Juvenile Justice*, 88

F.4th 939, 947 fn. 2 (11th Cir. 2023).  Therefore, the "convincing mosaic"

analysis is open-ended as to what facts or allegations can be considered, as long

as those facts and allegations, when considered *in toto*, could plausibly suggest

discriminatory intent. (*See Lewis v. City of Union City*, 934 F.3d at 1189 for this

Court's consideration of disparate pieces of evidence that "coalesce[ ] into a

mosaic of circumstantial evidence sufficient to create a triable issue of material

21

fact.")

In addition, this Court in *Lewis* also noted that, even when alleged comparators "do not meet the strict definition of similarly situated comparators . . . the evidence of their [disparate] treatment is not irrelevant." *Id.* at 1187 (interpolation added).  In other words, the same set of facts showing disparate treatment, although insufficient to establish a similarly-situated comparator, can still be useful in a "convincing mosaic" analysis.

In the instant appeal, Kennedy concedes that she did not establish a "similarly-situated comparator."  It is also undisputed that Kennedy has met the first two prongs of a *prima facie* case, and the third prong as well regarding the NCO and shift reassignment as actionable adverse employment actions.  *See* Doc. 54, p. 9 fn. 4. Therefore, the only issue under consideration is whether Kennedy has alleged enough facts to create a "convincing mosaic" suggesting discriminatory intent as an alternative to establishing a similarly situated comparator.

The allegations concerning the December 16, 2020, incident are crucial to Kennedy's claim in that they evince serious doubts about the non-discriminatory motivations of Pennington and Dunk for pursuing the employment actions they did against Kennedy even after reviewing exculpatory evidence, while taking no action whatsoever against Redman.  Moreover, Pennington's and Dunk's

22

decisions to impose an NCO and to transfer Kennedy to evening shift, where she was ineligible to apply for a daytime position for almost two years, added to a pattern by management of systematically protecting an employee of one race, to the point of ratifying false accusations, and of punishing an employee of a different race and ignoring her repeated complaints of harassment.[2]  The fact that Kennedy and Redman are of different races and were treated radically differently under these circumstances,  plausibly suggests a racially discriminatory motivation by management in the adverse employment actions taken against Kennedy.  Even though these allegations showing disparate treatment are not enough to establish a "similarly situated comparator," they are nevertheless relevant and should have been considered as "mosaic" evidence, as were the disparate treatment examples discussed in *Lewis*.  *See Lewis*, F.3d 934 at 1187.

However, the District Court's analysis of Kennedy's "convincing mosaic" argument is devoid of any and all facts related to the December 16, 2020, incident itself, and how Kennedy and Redman were each treated in the aftermath. Instead, the District Court relies only on other, ancillary facts alleged in the

---

[2] It should be noted that the second prong of the "convincing mosaic" standard denoting "systematically better treatment of similarly situated employees" as a possible form of "mosaic" evidence must necessarily entail a different set of considerations than the "comparator" analysis.  Otherwise, meeting that one prong would obviate the entire purpose of using the "convincing mosaic" as an alternative to establishing a "comparator."

complaint showing prior harassment of Kennedy by Redman and derogatory statements from Redman and Pennington about Caucasians in concluding that Kennedy had not met her pleading burden. Doc. 54 pp. 15-16.[3]

The complete omission of the allegations surrounding the December 16, 2020, incident in the District Court's analysis of Kennedy's "convincing mosaic" argument should negate the notion that a complete, proper, and fair analysis of this issue was provided in the District Court's ruling.

---

[3] While the Secretary did acknowledge Kennedy's argument that the December 16, 2020, incident, and the disparate treatment that followed despite exculpatory evidence, should be considered in a "mosaic" argument, it sought to pigeonhole those allegations, and the plausible inferences that could be drawn from them, as "conceptually a question of whether [Redman and Kennedy] are similarly situated comparators," contrary to this Court's analysis in *Lewis*. Doc. 53 p. 8 fn.4. However, as discussed *supra*, the "convincing mosaic" analysis is broader than that used to establish a "similarly situated comparator," and indeed the "convincing mosaic" analysis can act as a wholly alternative means of showing discriminatory motivation when a "similarly situated" comparator cannot be established. The Secretary therefore sought to tie allegations that may be useful under a broader analytical rubric ("mosaic" analysis) to a narrower rubric ("similarly situated comparator") under which those same allegations would fail. Because differences in treatment between Kennedy and Redman by management in light of recorded evidence of their respective conduct are the most important facts alleged in the Complaint, and do raise questions as to why management pursued the course against Kennedy that they did while ignoring Redman, such facts are highly relevant and probative and therefore should have been incorporated into the "mosaic analysis."

2.      **The District Court erred by misapplying the "convincing mosaic"**
**analysis when it conducted only a piecemeal analysis of the allegations.**

As discussed *supra*, the "convincing mosaic" is a totality drawn from various pieces of circumstantial evidence that, when considered *in toto*, can plausibly suggest discriminatory intent.  However, the District Court, in its "mosaic" analysis, treated each piece of evidence provided by Kennedy as if that piece of evidence, by itself, should have been capable of creating the "mosaic" from which an inference of discriminatory intent might be drawn, contrary to the manner in which the "convincing mosaic" was meant to be applied.  Doc. 54, pp. 14-18.

Firstly, while the District Court, in its "mosaic" analysis, analyzed the ancillary facts of Redman's and Pennington's comments, it subjected them to individual analysis, rather than as part of a "mosaic" in combination with other evidence.[4]  For example, the District Court concluded that Pennington's remarks

_____

[4]  The Secretary attempts to set up a strawman, which the District Court seemingly accepted, that the ancillary allegations of Redman's and Pennington's comments about Caucasians, and Redman's harassing conduct toward Kennedy prior to December 16, 2020, were intended by Kennedy to assert a history of *race-based* harassment of her by Redman.  *See* Doc. 54, p. 15  Kennedy only included these facts in the Complaint to show (1) prejudicial racial attitudes of a manager and the accusing co-worker, and (2) the inaction of management in the face of reports of harassment of Kennedy by Redman, corroborated by Redman herself.  *See* Doc. 45, ¶¶ 33-36.  These ancillary facts, together with the "central" facts alleged concerning December 16, 2020, and management's actions thereafter, do present a "convincing

25

about Caucasian men "is insufficient to plausibly infer discriminatory intent in the decision-making process," as if those were the only facts under consideration. *Id.* at 15.

The District Court then considered Kennedy's allegations (without mentioning the allegations stemming from December 16, 2020, and afterwards) that management had not responded to or acted upon Kennedy's prior complaints of harassment by Redman. *Id.* at 15-16. The District Court concluded that these allegations "are insufficient *on their own* to create a convincing mosaic from which an inference of discriminatory intent might be drawn." *Id.* at 16 (emphasis added).

Finally, the District Court analyzed Kennedy's "pretext" argument separately, tying it to a single ground (of three grounds asserted, two of which were false) in a single alleged adverse employment (the Notice of Proposed Suspension). *Id.* at 16. In doing so, the District Court ignored Kennedy's larger point that the circumstances surrounding her decision to surreptitiously record her interaction with Redman, and management's decision to pursue that ground for discipline nevertheless, could lead to an inference that a single legitimate ground for discipline was merely an attempt to provide a patina of legitimacy for

---

mosaic" suggesting that management was systematically protecting an African-American employee (Redman) and ignoring and/or actively seeking to punish a Caucasian employee (Kennedy).

all of the adverse employment actions taken against Kennedy.  *Id.*  In any case, Kennedy was not asserting evidence of "pretext" as sufficient, by itself, to show a "convincing mosaic," but as only one piece of evidence among many.  Again, however, the District Court concluded on the issue of "pretext" that the "Plaintiff has not presented a convincing mosaic of circumstantial evidence sufficient to infer discrimination."  *Id.* at 18.

There is no indication that the District Court considered these separate pieces of evidence together in concluding that Kennedy had not sufficiently pleaded a "convincing mosaic."  To the contrary, the separate conclusions set out in the District Court's ruling demonstrate a "piecemeal" rather than a "totality of evidence" approach.  Because such an approach is a misapplication of the "convincing mosaic" , the District Court should be reversed.

## <u>CONCLUSION</u>

The district court erred when it omitted from its "convincing mosaic" analysis consideration of the allegations related to the December 16, 2020, incident and the subsequent disparate treatments of Kennedy and Redman.  It also erred when it treated Kennedy's allegations supporting her "convincing mosaic" argument separately rather than in their totality.  For these reasons, this Court should reverse and vacate the District Court's decision and remand the case for further proceedings.

Respectfully submitted this 5th day of September, 2024.

<u>/s/ Scott G. Reddock</u>
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
Tel: 912.332.7077
Fax: 912.332.7179
reddgeg@aol.com
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-column limitations of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 5,408 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14 point font.

Respectfully submitted this 5th day of September, 2024.

/s/ Scott G. Reddock
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
912.332.7077
reddgeg@aol.com
Attorney for Appellant

## <u>CERTIFICATE OF SERVICE</u>

Today I served a copy of this Brief of the Appellant on the government by filing it on the Court's CM/ECF portal, which generates a notice of electronic filing that is delivered to all counsel of record, along with a link to retrieve a file-stamped copy of the document that I filed.

This 5th day of September, 2024.

<u>/s/ Scott G. Reddock</u>
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
Tel: 912.332.7077
Fax: 912.332.7179
reddgeg@aol.com
Attorney for Appellant