No. 24-11027

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**JAMIE KENNEDY**,

Plaintiff-Appellant,

v.

**SECRETARY, DEPARTMENT OF DEFENSE,**

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Southern District of Georgia

---

**BRIEF OF APPELLEE
THE SECRETARY**

---

JILL E. STEINBERG
UNITED STATES ATTORNEY

Channell V. Singh
Assistant United States Attorney
United States Attorney's Office
Post Office Box 8970
Savannah, GA 31401
(912) 652-4422

No. 24-11027
Kennedy v. Secretary, Department of Defense

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Baker, Hon. R. Stan

Bates, Katie R.

Department of Defense

Kennedy, Jamie

Patrick, Bradford Collins

Ray, Hon. Christopher L.

Reddock, Scott G.

Secretary of Defense

Singh, Channell Veena

Steinberg, Jill E.

Stuchell, James C.

No publicly traded company or corporation has an interest in the
outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case.  The facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.  *See* Fed. R. App. P. 34(a)(2)(C).

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND
     CORPORATE DISCLOSURE STATEMENT ...................... C-1 of 1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CONTENTS ............................................................ii

TABLE OF CITATIONS ..........................................................vi

STATEMENT OF JURISDICTION..........................................1

STATEMENT OF THE ISSUE................................................1

STATEMENT OF THE CASE .................................................2

    I.    Facts .......................................................2

        A.    Kennedy started working at the commissary as a
            cashier ...................................................2

        B.    Kennedy reported another cashier's use of the
            n-word.............................................................2

        C.    After Kennedy was promoted to store worker, she never
            reported that her supervisor, Pennington, and fellow
            store worker, Redman, shared comments about their
            experiences with white people. She, likewise, never
            reported that Redman often said the n-word. ...............3

        D.    Redman reported "ongoing tension" between her and
            Kennedy, whom Redman believed was racist ..............4

        E.    Redman reported that Kennedy called her the
            n-word.............................................................6

F.    Kennedy was ordered to have no contact with Redman, reassigned from day shift to evening shift, and issued a notice of proposed suspension, which she never served ........................................................................9

G.    Kennedy wished to apply for a higher-paying, daytime meat cutter position, but did not apply because the no-contact order and shift reassignment "were still in place" ......................................................................10

II.    Procedural History. .............................................................11

A.    Kennedy filed an EEO complaint, challenging the no-contact order, shift reassignment, and proposed suspension ....................................................................11

B.    Kennedy filed a complaint in the district court, challenging, under Title VII, the no-contact order, shift reassignment, and proposed suspension because she was allegedly falsely accused of calling Redman the n-word ...............................................................12

C.    The Secretary moved to dismiss Kennedy's third amended complaint because Kennedy failed to plausibly plead:  (1) that the proposed suspension was an actionable adverse action; and (2) an inference of causation between her race and the no-contact order and shift reassignment ..........................................13

D.    In response, Kennedy argued that her complaint showed causation because Redman was a similarly situated comparator, and that a convincing mosaic of facts she alleged inferred unlawful disparate treatment. She did not disagree that her proposed suspension was not an actionable adverse action............................................15

E.    The Secretary replied, maintaining that Kennedy failed

to plausibly plead either direct or circumstantial bases for discriminatory intent ...............................................17

    1.    No Direct Discriminatory Intent .......................17

    2.    No Circumstantial Discriminatory Intent .........18

        a.    Past Comments of Pennington and Redman ...................................................................18

        b.    Kennedy's Complaints about Redman ..... 19

        c.    Kennedy's Discipline................................. 20

F.    The district court dismissed Kennedy's third amended complaint, finding that she failed to plausibly plead sufficient allegations to infer causation between her race and the no-contact order and shift reassignment ...... 21

    1.    Past Comments of Pennington and Redman ....22

    2.    Kennedy's complaints about Redman ...............22

    3.    Kennedy's Discipline ..........................................23

III.    Standard of Review ...............................................24

SUMMARY OF ARGUMENT ................................................24

ARGUMENT ........................................................................25

The district court's Rule 12(b)(6) dismissal of Kennedy's third amended complaint, claiming Title VII racial discrimination against her employer, was correct because the complaint failed to allege sufficient facts to plausibly infer discriminatory intent behind the employer's changing her shift and ordering her to have

no contact with a co-worker whom she allegedly called a racial epithet............................................................................................ 25

    A.   The reasons for the district court's dismissal are irrelevant because this Court's review is de novo ....... 25

    B.   The district court's dismissal was correct because the third amended complaint failed to plead a plausible inference of discriminatory intent to state a Title VII claim ........................................................................... 26

        1.   No Inference of Discriminatory Intent from Comments by Redman and Pennington about Caucasians ......................................................... 28

        2.   No Inference of Discriminatory Intent from Complaints about Redman before December 16, 2020 .................................................................. 30

        3.   No Inference of Discriminatory Intent from No-Contact Order and Shift Change After December 16, 2020 Incident ............................................. 30

CONCLUSION ........................................................................... 38

CERTIFICATE OF COMPLIANCE AND SERVICE ........................... 39

# TABLE OF CITATIONS

**Cases**                                                                    Page(s)

*Arrington v. Ala. Power Co.*, 769 F. App'x 741 (11th Cir. 2019) ............35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................27

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)............36

*Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012).................37

*Doe v. Samford Univ.*, 29 F.4th 675 (11th Cir. 2022).......................32, 34

*Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000)..................36

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
558 F.3d 1301 (11th Cir. 2009) ..............................................................24

*Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019).................33

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019).................36

*Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020)...........36

*Moorman v. UnumProvident Corp.*, 464 F.3d 1260 (11th Cir. 2006).....26

*Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325 (11th Cir. 2024).........29

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).........27

*Stancombe v. New Process Steel LP*, 652 F. App'x 729
(11th Cir. 2016) ...............................................................................32-33

*Steger v. General Elec. Co.*, 318 F.3d 1066 (11th Cir. 2003) ..................29

*Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239 (11th Cir. 2015) .....27

vi

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023)............35

*Worthy v. City of Phenix City*, 930 F.3d 1206 (11th Cir. 2019) ..............26

**Statutes**

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

*42 U.S.C. § 2000e et seq. ..................................................................1

**Rules**

11th Cir. R. 25-3(a) ..........................................................................39

11th Cir. R. 28-5 ................................................................................1

Fed. R. App. P. 4(a).............................................................................1

Fed. R. App. P. 25(c)(1)(C) ...............................................................39

Fed. R. App. P. 25(c)(2) ....................................................................39

Fed. R. App. P. 32(a)(5) ....................................................................39

Fed. R. App. P. 32(a)(6) ....................................................................39

Fed. R. App. P. 32(a)(7)(B) ...............................................................39

Fed. R. App. P. 32(a)(7)(B)(iii)..........................................................39

Fed. R. App. P. 34(a)(2)(C) ..................................................................i

*Fed. R. Civ. P. 12(b)(6)..................................................... 1, 13, 24-25, 27

## STATEMENT OF JURISDICTION

This is an appeal from a final decision of the United States District Court for the Southern District of Georgia dismissing Jamie Kennedy's third amended complaint in an employment-discrimination case. The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e et seq. The court entered judgment dismissing Kennedy's complaint on February 5, 2024. (Doc. 56.)[1] Kennedy timely filed a notice of appeal on April 2, 2024. (Doc. 57.) *See* Fed. R. App. P. 4(a). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court's Rule 12(b)(6) dismissal of Kennedy's third amended complaint, claiming Title VII racial discrimination against her employer, was correct because the complaint failed to allege sufficient facts to plausibly infer discriminatory intent behind the

---

[1] As required by this Court's Rule 28-5, citations to the record refer to the document and page number "that appears in the header generated by the by the district court's electronic filing system."

1

employer's changing her shift and ordering her to have no contact with a co-worker whom she allegedly called a racial epithet.

## STATEMENT OF THE CASE

### I.    Facts.

#### A.    Kennedy started working at the commissary as a cashier.

Kennedy's third amended complaint alleged these facts.  In May 2019, Kennedy, who is Caucasian, began working as a cashier at the commissary on the federal military installation at Hunter Army Airfield. (Doc. 45 at 2-3.)  Hope Joseph, the front-end manager, was Kennedy's immediate supervisor.  (Doc. 45 at 4.)  Deputy Store Manager Wade Broomfield was Kennedy's second-line supervisor.  (Doc. 45 at 3.)  Store Manager Marites Pennington was Kennedy's third-line supervisor.  (Doc. 45 at 3.)  Broomfield is Caucasian, and Pennington is Filipina-American. (Doc. 45 at 3.)  The third amended complaint did not allege Joseph's race. (Doc. 45 at 4.)

#### B.    Kennedy reported another cashier's use of the n-word.

In October 2019, Kennedy overheard another cashier, Rashonda Chavis,[2] who is African-American, say an iteration of the n-word twice during a conversation with co-workers. (Doc. 45 at 4.) Kennedy reported Chavis's language to Joseph, who subsequently informed Broomfield. (Doc. 45 at 4.) The following day, Joseph, Broomfield, Chavis, and Kennedy met to discuss Chavis's use of the n-word. (Doc. 45 at 4.) Chavis denied saying the word. (Doc. 45 at 4.) No further action was taken. (Doc. 45 at 4.)

**C. After Kennedy was promoted to store worker, she never reported that her supervisor, Pennington, and fellow store worker, Redman, shared comments about their experiences with white people. She, likewise, never reported that Redman often said the n-word.**

In March 2020, Kennedy was promoted to the role of store worker. (Doc. 45 at 3.) Her immediate supervisor changed from Joseph to Grocery Manager Vera Dunk while Broomfield and Pennington remained Kennedy's second- and third-line supervisors. (Doc. 45 at 3.) As store worker, Kennedy worked 24 hours a week for $18.29 an hour. (Doc. 45

---

[2] Because the third amended complaint refers to Rashonda's last name as Chavis six times and as Davis one time, the Secretary refers to it as Chavis. (Doc. 45 at 4.)

at 3.)  In April 2020, Pennington told Kennedy, "I only married [my ex-husband] to get out of the Philippines. I don't even like white guys."  (Doc. 45 at 4 (alterations in original).)    Pennington's ex-husband was Caucasian.  (Doc. 45 at 4.)  Around this time, another store worker, Ellistina Redman, who is African-American, "made multiple comments to Kennedy expressing her displeasure" about her son marrying a white woman.  (Doc. 45 at 4.)  Redman added that when her son was younger, "she would not allow him to stay overnight with his white friends at their homes because she did not 'trust white people to treat him well.'"  (Doc. 45 at 4.)  Redman also said the n-word at work multiple times.  (Doc. 45 at 5.)  Kennedy never reported these statements made by Pennington and Redman.  (Doc. 45 at 4-5.)

### D.  Redman reported "ongoing tension" between her and Kennedy, whom Redman believed was racist.

In July 2020, Redman warned Kennedy to avoid their co-worker, Cassidie Alexander, whom Redman believed to be a "spy."  (Doc. 45 at 5.)  Alexander is Caucasian.  (Doc. 45 at 5.)  Kennedy told Alexander about Redman's warning.  (Doc. 45 at 5.)  Alexander complained to Pennington, who addressed the matter with Redman.  (Doc. 45 at 5.)  The next day,

Redman told Kennedy, "You got messy," which Kennedy interpreted as referring to Kennedy's "decision to share Redman's 'spy' comment with Alexander." (Docs. 45 at 5; 54 at 3.)  A day or two later, while on break outside the commissary, "Redman called Kennedy a 'motherfucking bitch,' among other profanity." (Doc. 45 at 5.)  Kennedy did not report this incident because this was the first negative incident between her and Redman, and Kennedy believed the issue would "blow over." (Doc. 45 at 5.)

Redman, on the other hand, requested a meeting with Pennington, Broomfield, and Kennedy to address her and Kennedy's "ongoing tension." (Doc. 45 at 5.)  At the meeting, Redman admitted that she cursed at Kennedy, and Redman said that if she wanted to slap Kennedy, she could have done so without repercussions because she was on break. (Doc. 45 at 5.)  When Pennington exited the meeting, Redman told Broomfield that she believed Kennedy was racist.  (Doc. 45 at 5-6.)  Broomfield objected to Redman's characterization after which Redman answered that Kennedy had told her that she supported then-President Donald Trump.  (Doc. 45 at 6.)

After the meeting, between July 16 and December 16, 2020, Redman often stared at Kennedy and, when crossing paths with Kennedy, "assum[ed] a physically intimidating posture ('bowing up')" or "physically block[ed] Kennedy's path." (Doc. 45 at 6.) Kennedy started riding in a motorized scooter at work because of a back injury. (Doc. 45 at 6.) Kennedy overheard Redman tell other co-workers that Kennedy was "milking it." (Doc. 45 at 6.) Kennedy also overheard Redman complain about her work performance and the cleanliness of her workstation to other co-workers. (Doc. 45 at 6.) Between July 16 and August 18, 2020, Kennedy complained to Dunk three or four times about Redman's behavior. (Doc. 45 at 6.) As far as Kennedy was aware, Dunk took no "corrective action" except on August 18, 2020 when Dunk told Kennedy that she had spoken with Redman about Kennedy's complaints. (Doc. 45 at 6-7.)

## E.    Redman reported that Kennedy called her the n-word.

On December 16, 2020, Kennedy was in the commissary's administration office filling out paperwork when Redman came behind her and demanded, in what Kennedy described as "an overly aggressive tone," that Kennedy give her the key which opened several doors in the

commissary's warehouse, including the receiving office.  (Doc. 45 at 7.) Kennedy held out the key, and Redman snatched it from Kennedy's hand. (Doc. 45 at 7.)  Kennedy then gathered her paperwork to complete at the receiving office.  (Doc. 45 at 8.)  Commissary employees had to keep the receiving office locked unless they were working in it.  (Doc. 45 at 8.)  So, Kennedy knew that if Redman was not in the office, she would have to see Redman for the key to open the door.  (Doc. 45 at 8.)  As Kennedy approached the receiving office, she saw Redman standing inside the doorway.  (Doc. 45 at 8.)  She started using her cell phone to record the encounter with Redman.  (Doc. 45 at 8.)  Her cell phone captured the following exchange:

> Kennedy:  Pardon Me.
>
> Redman:  What the fuck did you just say to me?
>
> Kennedy:  I said pardon me. Pardon me.
>
> Redman:  Don't play with me Jamie, I try not to say nothing to you. You already know I can't stand you. Here's the keys. Don't do that. Go ahead and tell Vera because I don't care anymore.
>
> Kennedy:  I said pardon me.
>
> Redman:  No, you did not.

7

Kennedy:   Yes, I did. Then you should get your ears checked.

Redman:   I don't need my fucking ears checked. But if you call me another [n-word], it's gonna be me and you, okay?

Kennedy:   What? Nobody said that.

Redman:   That's what you exactly said.

Kennedy:   No it is not. I've never called anybody that.

Redman:   You just did.

Kennedy:   Uh, no I didn't.

Redman:   I'll make sure you pay for it. See if I don't do it. Telling you right now. I don't appreciate that honey.

(Doc. 45 at 8-9.)

Afterward, Kennedy told the meat manager that she needed to go to lunch.   (Doc. 45 at 9.)   Meanwhile Redman told Joseph, the commissary's front-end manager, that Kennedy called her the n-word. (Doc. 45 at 9.)  Joseph, in turn, contacted the zone manager who directed Joseph to collect statements from those involved in the incident.  (Doc. 45 at 9.)   Joseph also told Pennington and Dunk about Redman's report. (Doc. 45 at 9.)  When Kennedy returned from lunch, she told the meat manager what had happened, and the meat manager told Kennedy that

8

Joseph and Pennington had come by and told him that Kennedy had called Redman the n-word. (Doc. 45 at 9.) Kennedy showed the meat manager the recording from her cell phone, and he agreed that he did not hear Kennedy call Redman the n-word. (Doc. 45 at 9.) He told Kennedy that she "had nothing to worry about," and not to delete the recording. (Doc. 45 at 9.)

In the following days, Kennedy twice met with Pennington and Dunk. (Doc. 45 at 9-10.) In the first meeting, Pennington and Dunk declined Kennedy's offer to watch her cell phone recording. (Doc. 45 at 9-10.) However, at the instruction of someone from human resources, they watched the recording in the second meeting. (Doc. 45 at 10.) Both stated that they did not hear Kennedy call Redman the n-word, but they still accused her of harassing Redman. (Doc. 45 at 10.)

**F.    Kennedy was ordered to have no contact with Redman, reassigned from day shift to evening shift, and issued a notice of proposed suspension, which she never served.**

On December 22, 2020, Pennington and Dunk issued Kennedy an order to have no contact with Redman. (Doc. 45 at 10.) Kennedy was also moved from day shift to evening shift. (Doc. 45 at 10.) Redman was not issued an order to have no contact with Kennedy. (Doc. 45 at 10.)

9

Dunk consulted with an employee relations specialist about how to proceed with disciplinary action against Kennedy. (Doc. 45 at 10.) The specialist told Dunk that Dunk had a range of options, including a written warning, a letter of reprimand, and suspension. (Doc. 45 at 10.) Dunk proposed a 7-day suspension for Kennedy and referred the proposal to Pennington, who approved it. (Doc. 45 at 10.) On February 26, 2021, Kennedy was issued a notice of the proposed suspension, stating that it was appropriate because Kennedy: (1) called Redman the n-word; (2) had, in directing a racial slur at Redman, racially harassed Redman; and (3) violated the commissary's policy "by surreptitiously recording her interaction with Redman." (Doc. 45 at 11-12.)

In Spring 2021, Jovelyn Rountree replaced Pennington as store manager and became Kennedy's third-line supervisor. (Doc. 45 at 3.) Rountree is African-American. (Doc. 45 at 3.) On June 2, 2021, Rountree issued a decision letter which upheld the proposed 7-day suspension. (Doc. 45 at 12-13.) But, Kennedy did not allege that she actually served this suspension. (Doc. 45 at 13-14.)

**G.  Kennedy wished to apply for a higher-paying, daytime meat cutter position, but did not apply because the no-**

**contact order and shift reassignment "were still in place."**

In August or September 2021, Kennedy wished to apply for a daytime position as a meat cutter, which paid $19.07 to $22.27 an hour for 32 hours a week. (Doc. 45 at 11.) The head of the meat department invited Kennedy to "detail" for the position before its official announcement. (Doc. 45 at 11, 14.) Kennedy asked Rountree if the no-contact order and shift reassignment prevented her from applying, and Rountree told her that the order and shift reassignment "were still in place." (Doc. 45 at 11.) So, Kennedy did not apply for the position. (Doc. 45 at 14.)

## II.    Procedural History.

### A.    Kennedy filed an EEO complaint, challenging the no-contact order, shift reassignment, and proposed suspension.

On December 17, 2020, Kennedy filed an informal Equal Employment Opportunity ("EEO") complaint, challenging the no-contact order and shift reassignment. (Doc. 45 at 12, 13 n.3.) She alleged racial discrimination related to the incident with Redman on December 16, 2020 "as well as long-standing unredressed harassment and reprisal for

prior complaints." (Docs. 45 at 12; 54 at 7.) On February 1, 2021, Kennedy received leave to file a formal EEO complaint, which she did on February 9, 2021. (Docs. 45 at 12; 54 at 7.) Kennedy amended her EEO complaint to challenge the proposed suspension after she received notice of it on February 26, 2021. (Docs. 45 at 12; 54 at 7.) However, because the investigation of Kennedy's complaint was closed on June 3, 2021, a day after Roundtree upheld the proposed suspension on June 2, 2021, Kennedy filed a separate EEO complaint to challenge the actual suspension. (Doc. 45 at 13.) On August 23, 2021, Kennedy's first EEO complaint was denied, allowing her to file a complaint in the district court while she continued to pursue administrative remedies for the second complaint. (Docs. 45 at 13, 13 n.3; 54 at 7 n.3.)

**B.** **Kennedy filed a complaint in the district court, challenging, under Title VII, the no-contact order, shift reassignment, and proposed suspension because she was allegedly falsely accused of calling Redman the n-word.**

On November 21, 2021, Kennedy filed a complaint in the district court, challenging, under Title VII of the Civil Rights Act of 1964, the no-contact order, shift reassignment, and proposed suspension. (Doc. 1 at 1.) Kennedy thrice amended this complaint. (Docs. 1; 14; 22; 27; 31; 32;

12

42 at 16; 45.) Alleging the facts outlined above, Kennedy's third amended complaint claimed that the Defense Commissary Agency ("DeCA"), a component of the Department of Defense, subjected Kennedy to disparate treatment based on race in violation of Title VII when it proposed to suspend her, changed her shift, and ordered her to have no contact with Redman after she was falsely accused of calling Redman the n-word. (Doc. 45 at 14-15.)

### C. The Secretary moved to dismiss Kennedy's third amended complaint because Kennedy failed to plausibly plead: (1) that the proposed suspension was an actionable adverse action; and (2) an inference of causation between her race and the no-contact order and shift reassignment.

The Secretary of the Department of Defense moved to dismiss Kennedy's third amended complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a plausible claim for relief. (Doc. 46 at 1, 7.) First, the Secretary argued that Kennedy failed to plausibly plead that the proposed suspension was an actionable adverse action because she failed to allege that the proposed suspension altered the terms, conditions, or privileges of her employment. (Doc. 46 at 8-10.) Second, the Secretary argued that Kennedy failed to plead a plausible

inference of causation between her race and the purported adverse actions for three reasons. (Doc. 46 at 10, 16-17.)

One, Kennedy failed to point to a similarly-situated comparator. (Doc. 46 at 10.) The two potential comparators, Chavis and Redman, were not valid comparators because the third amended complaint did not plausibly allege that either one was similarly situated in all material respects to Kennedy. (Doc. 46 at 12.) Chavis was a cashier whereas Kennedy was a store worker at the time of the December 16, 2020 incident. (Doc. 46 at 12.) Chavis reported to different supervisors (Joseph and Broomfield) than those involved in the decision to investigate Kennedy's use of the n-word (Dunk, Pennington, and Murray) and uphold her proposed suspension (Rountree). (Doc. 46 at 12-13.) Chavis also used a different iteration of the n-word during conversation instead of calling a co-worker the n-word. (Doc. 46 at 13.) And, Kennedy violated agency policy by surreptitiously recording a co-worker. (Doc. 46 at 13.) Although Redman said the n-word "on multiple occasions," Kennedy did not allege that supervisors were ever made aware of Redman's use of the word. (Doc. 46 at 13.) Moreover, Redman's cursing, accusation of racism, intimidation, and gossip were not sufficiently

14

similar to calling a co-worker the n-word or recording a co-worker without consent.  (Doc. 46 at 14.)

Two, the Secretary noted that even though Kennedy was not required to allege a comparator at the pleading stage, alleging a comparator outside of a plaintiff's class was a common thread among disparate treatment claims that survived motions to dismiss, and that Kennedy had not alleged any other basis to infer causation.  (Doc. 46 at 10-11, 17.)  Lastly, the Secretary argued that Kennedy had not come forward with any authority showing that Title VII protected an employee from wrongful accusations of using a racial slur against someone.  (Doc. 46 at 15.)

> **D.  In response, Kennedy argued that her complaint showed causation because Redman was a similarly situated comparator, and that a convincing mosaic of facts she alleged inferred unlawful disparate treatment. She did not disagree that her proposed suspension was not an actionable adverse action.**

Kennedy responded to the Secretary's motion.  (Doc. 51.)  First, Kennedy did not oppose the dismissal of her disparate treatment claim for failure to plausibly plead that her proposed suspension was an actionable adverse action.  (Doc. 51 at 1, 4, 6-7.)  As for pleading a

plausible inference of causation between her race and the no-contact order and shift reassignment, Kennedy generally argued that she "ha[d] sufficiently alleged that Redman was a similarly situated comparator," and that determining whether she and Redman were similarly situated in all material aspects was a fact-intensive inquiry "better suited to summary judgment."  (Doc. 51 at 1-2.)

Additionally, Kennedy argued that she could "easily establish a *prima facie* case of disparate treatment by a 'convincing mosaic'" based on:  (1) the past comments made by Redman and Pennington about Caucasians; (2) her complaints about Redman to management before December 16, 2020; and (3) her discipline by Pennington and Dunk for the December 16, 2020 incident between her and Redman in light of the cell phone recording, which did not show her calling Redman the n-word.  (Doc. 51 at 5.)  She claimed that her discipline was "purely pretextual."  (Doc. 51 at 6.)  She only technically violated the commissary's policy against surreptitious recording because her supervisors had ignored her prior complaints regarding Redman's harassment, and so she "was forced to record [Redman]".  (Doc. 51 at 6.)  And, she claimed that Title VII protected her from Redman's false accusation of having said the n-word

because "this racial slur is one that, when used by a Caucasian toward an African-American, carries a greater weight and offensiveness than if used by any other racial group." (Doc. 51 at 7.) Therefore, Kennedy concluded that "it is entirely because of [her] own race that this false accusation, and the employment actions that flowed from it, [were] so grave and damaging." (Doc. 51 at 7.)

### E. The Secretary replied, maintaining that Kennedy failed to plausibly plead either direct or circumstantial bases for discriminatory intent.

The Secretary replied to Kennedy's response. (Doc. 53.) First, the Secretary argued that by not opposing the dismissal of her disparate treatment claim premised on her supervisors' proposal to suspend her, Kennedy conceded that she failed to plausibly plead that the proposed suspension was an actionable adverse action. (Doc. 53 at 1.) Second, the Secretary maintained that Kennedy failed to plausibly allege that either her no-contact order or shift change occurred, directly or circumstantially, because she was Caucasian. (Doc. 53 at 2, 4-5.)

### 1. No Direct Discriminatory Intent.

The Secretary argued that Kennedy failed to show direct discrimination based on her being falsely accused of calling Redman the

n-word because "an individual is not a *victim* of racial harassment by . . . being accused of doing so." (Doc. 53 at 2-4) (emphasis in original.) "A person's behavior is not an immutable characteristic like race. To hold otherwise would give employers an impossible choice when confronted with disputed allegations of racial harassment, exposing the employer to potential liability regardless of whether it takes action to separate the employees." (Doc. 53 at 4.)

### 2. No Circumstantial Discriminatory Intent.

And, the Secretary argued that Kennedy failed to plausibly allege a circumstantial basis to infer discriminatory motive—either through a similarly situated comparator or a convincing mosaic. Redman was not a valid comparator because DeCA could not discipline Redman for using racial slurs or engaging in racial harassment when Kennedy never accused Redman of doing so. (Doc. 53 at 6.) Also, Redman did not make a non-consensual recording of Kennedy or any other co-worker. (Doc. 53 at 6.) And, for the following reasons, the Secretary argued that Kennedy's alleged facts did not come close to a plausible, much less a convincing mosaic of discriminatory intent. (Doc. 53 at 7.)

### a. Past Comments of Pennington and Redman.

18

Pennington's comment that she did "not like white guys" and married her Caucasian ex-husband to get out of the Philippines, made in April 2020—approximately eight months before Kennedy's no-contact order and shift reassignment—was far too attenuated to suggest that the disciplinary actions were taken because of Kennedy's race. (Doc. 53 at 7.) And, Kennedy did not allege that she alerted her supervisors to Redman's expressed displeasure regarding her son marrying a white woman and staying overnight with white friends. (Doc. 53 at 7.) Moreover, Redman's comments were not relevant in divining her supervisors' motives. (Doc. 53 at 6.) Even if they were, the comments made in Spring 2020 were "too remote and non-specific to plausibly suggest that [Redman's] alleged harassment that began months later, in July 2020, w[ere] based on Kennedy's membership in a protected group." (Doc. 53 at 8.)

### b.    Kennedy's Complaints about Redman.

Kennedy failed to plausibly plead that her complaints about Redman, made before December 16, 2020, had anything to do with her race. (Doc. 53 at 7.) The bases for the complaints were race-neutral,

including Kennedy's sharing of gossip and Kennedy's work performance. (Doc. 53 at 8.)  Kennedy could not make actionable ordinary workplace tribulations by turning a personal feud between herself and Redman into a Title VII claim.  (Doc. 53 at 8.)

### c.    Kennedy's Discipline.

Although Kennedy alleged that—on December 16, 2020—Redman shouted, used profanity, levied false accusations, and made threats while Kennedy did not and, yet, was still disciplined, Kennedy was not disciplined for the behavior she alleged Redman to have engaged in. (Doc. 53 at 6, 8 n.4.)  Rather, Kennedy was disciplined for calling Redman the n-word and violating the commissary's policy against making surreptitious recordings.  (Doc. 53 at 6, 8 n.4.)  And, although Kennedy claimed that her discipline for admittedly violating the commissary's policy was pretextual, Kennedy's claim was "purely conclusory." (Doc. 53 at 8.)  Kennedy did not allege that DeCA enforced the prohibition on making recordings in the workplace differently in similar cases.  (Doc. 53 at 9.)  Accordingly, the Secretary argued that Kennedy "proffered no plausible basis for the inference that her race was the 'real reason' for the alleged adverse actions."  (Doc. 53 at 9.)

20

**F.    The district court dismissed Kennedy's third amended complaint, finding that she failed to plausibly plead sufficient allegations to infer causation between her race and the no-contact order and shift reassignment.**

The district court granted the Secretary's motion to dismiss, finding that the third amended complaint failed to plausibly allege a Title VII racial discrimination claim.  (Doc. 54 at 1, 3 n.1.)  As an initial matter, the court noted that several courts "have held that for claims of race discrimination under Title VII, allegations that an adverse action was taken against an employee because he was falsely accused of being racist, rather than because of the employee's own race, do not suffice to constitute race discrimination."   (Doc. 54 at 10 n.6 (cleaned up).)  Nevertheless, the court assumed "that this potential fundamental flaw in [Kennedy's] claim [did] not preclude the traditional Title VII analysis." (Doc. 54 at 11 n.6.)  The court ultimately based its dismissal on Kennedy's failure to plausibly plead sufficient allegations to infer causation between Kennedy's race and the purported adverse employment actions of the no-contact order and shift change.  (Doc. 54 at 18, 9 n.4.)

First, the court found that Kennedy failed to plausibly plead that she and Redman were similarly situated comparators because they were

"not engaged in the same basic conduct." (Doc. 54 at 14) (cleaned up.) The third amended complaint alleged that Redman assumed a physically intimidating posture and complained to other employees about Kennedy's work performance, "while Kennedy was reported for using a racial epithet and violating agency policy by surreptitiously recording the altercation" between her and Redman. (Doc. 54 at 13-14.) Second, the court rejected Kennedy's argument that she established a prima facie case of disparate treatment by a convincing mosaic for the following reasons.

### 1.    Past Comments of Pennington and Redman.

First, the court found that any prior prejudicial comments made by Redman were irrelevant because Redman was not a decisionmaker for any adverse employment action suffered by Kennedy. (Doc. 54 at 14-15.) Pennington's April 2020 comment that she "only married her ex-husband to get out of the Philippines and she doesn't even like white guys" was too attenuated in both time and substance to plausibly infer discriminatory intent in the decision-making process. (Doc. 54 at 15 (cleaned up).)

### 2.    Kennedy's complaints about Redman.

Next, the court found that Kennedy "never reported to Pennington or Dunk that Redman was harassing her due to her race." (Doc. 54 at 15.)

### 3. Kennedy's Discipline.

Lastly, the court found that the differences in the alleged underlying conduct by Redman and Kennedy on December 16, 2020 were insufficient to create a convincing mosaic from which an inference of discriminatory intent might be drawn for much of the same reasons that Redman could not plausibly be considered a similarly situated comparator to Kennedy. (Doc. 54 at 15-16.) And, Kennedy failed to plead sufficient facts to show that the disciplinary action against her was purely pretextual. (Doc. 54 at 16.) The court found that Kennedy alleged "nothing to even insinuate that her employer failed to clearly articulate or follow its formal policies regarding recording employees, nor did she allege that she did not violate the policy." (Doc. 54 at 16-17.) She cited no authority to support her position and simply relied on her contention that she was forced to record her interaction with Redman due to her employer's inactions. (Doc. 54 at 17.) Kennedy did not challenge the

23

policy itself or argue that some exception applied, "or attempt to show that the policy was selectively enforced in other contexts." (Doc. 54 at 17.) "Her only argument [was] her own subjective perception that the policy should not have been enforced in this context because of her history with Redman." (Doc. 54 at 17.) Consequently, the district court found that Kennedy "failed to plead facts sufficient to show that her violation of the no-recording policy was a pretextual basis" for her discipline or that it was otherwise the result of discrimination. (Doc. 54 at 18.)

The court entered judgment dismissing Kennedy's third amended complaint and Kennedy filed her timely notice of appeal. (Docs. 56-57.)

## III. Standard of Review.

This Court reviews, de novo, a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 (11th Cir. 2009).

## SUMMARY OF ARGUMENT

Kennedy's third amended complaint claimed that her employers, in violation of Title VII's prohibition against racial discrimination, changed her shift and ordered her to have no contact with a co-worker whom she

allegedly called a racial epithet. The district court correctly dismissed Kennedy's complaint for failure to state a claim because the complaint failed to plausibly plead an inference of discriminatory intent for her employer's decisions. Consequently, the district court's dismissal should be affirmed.

## ARGUMENT

**The district court's Rule 12(b)(6) dismissal of Kennedy's third amended complaint, claiming Title VII racial discrimination against her employer, was correct because the complaint failed to allege sufficient facts to plausibly infer discriminatory intent behind the employer's changing her shift and ordering her to have no contact with a co-worker whom she allegedly called a racial epithet.**

### A.    The reasons for the district court's dismissal are irrelevant because this Court's review is de novo.

Kennedy claims that the district court's dismissal should be reversed for two reasons. (Kennedy Br. 9, 26-28, 33, 36.) One, Kennedy argues that as part of her convincing mosaic of facts to show discriminatory intent, "the district court did not consider the allegations related to the incident on December 16, 2020, between [her] (Caucasian) and Redman (African-American), or management's subsequent differing disciplinary treatment of each in light of recorded evidence of the

25

incident." (Kennedy Br. 26.) Two, she argues the district court "misappl[ied] the 'convincing mosaic' analysis when it conducted only a piecemeal analysis of the allegations" it did consider. (Kennedy Br. 27, 33.) However, the district court's analysis is irrelevant. In applying de novo review, this Court reviews the judgment, not the soundness of the district court's explanation for it. *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1267 (11th Cir. 2006). Irrespective of its reasoning, the district court's dismissal of the third amended complaint should be affirmed because it was correct. *Worthy v. City of Phenix City*, 930 F.3d 1206, 1216-17 (11th Cir. 2019) (holding that, when review is de novo, this Court may affirm for any reason supported by the record, even if not relied upon by the district court).

**B.   The district court's dismissal was correct because the third amended complaint failed to plead a plausible inference of discriminatory intent to state a Title VII claim.**

The district court's dismissal of Kennedy's third amended complaint was correct, because, by failing to allege enough facts to infer discriminatory intent behind her employer's no-contact order and shift change, she failed to state a claim for relief under Title VII. To survive a

motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, which, accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Title VII provides that it is unlawful for an employer to discriminate against an employee because of the employee's race." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245-46 (11th Cir. 2015). At the summary judgment stage, a Title VII plaintiff may prove a prima facie case of race discrimination by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (cleaned up). At the pleading stage, however, a plaintiff need not plead a prima facie case of discrimination. *Surtain*, 789 F.3d at 1246. Rather, to state a claim under Title VII, a complaint, "need only provide enough factual matter (taken as true) to suggest intentional race discrimination." *Id.* (cleaned up). Kennedy's third amended complaint did not plead enough facts to suggest intentional race discrimination.

Kennedy claims that the third amended complaint's following allegations suggested intentional race discrimination: (1) the past

27

comments made by Redman and Pennington about Caucasians; (2) her complaints about Redman to management before December 16, 2020; and (3) her discipline by Pennington and Dunk for the December 16, 2020 incident between her and Redman in light of the cell phone recording, which did not show her calling Redman the n-word.  (Kennedy Br. 30-31, 33-34 n.4, 34-35.)  None of these allegations plausibly pled an inference of discriminatory intent.

### 1. No Inference of Discriminatory Intent from Comments by Redman and Pennington about Caucasians.

The third amended complaint alleged that in April 2020, Marites Pennington, Kennedy's third-line supervisor, who was Filipina American, told Kennedy that she married her Caucasian ex-husband to get out of the Philippines, and that she did not "even like white guys." (Doc. 45 at 3-4.)  Around this same time, Kennedy's fellow store worker, Redman, who was African American, told Kennedy that she was displeased that her son was marrying a white woman and that she did not allow her son to stay overnight with white friends when he was younger because she did not "trust white people to treat him well."  (Doc.

45 at 4.)  Kennedy never informed Pennington, Dunk, or anyone else about Redman's comments.  (Doc. 45 at 4-5.)

These comments do not suggest or give rise to a plausible inference that the challenged actions were motivated by racial discrimination. First, statements of non-decisionmakers are not relevant evidence of discrimination.  *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003).  Redman did not make the decisions to change Kennedy's shift or issue the no-contact order.  (Doc. 45 at 10.)  So, Redman's unreported comments were irrelevant to state a plausible inference of discriminatory intent.  Second, generalized racism directed at others is not sufficient to show discriminatory intent unless it has some relationship with the employment decision in question. *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1340 (11th Cir. 2024).  Pennington's single comment about her amorous preferences made on a single occasion in April 2020, eight months before Kennedy's December 2020 no-contact order and shift change, had no relationship with those employment decisions.  (Doc. 45 at 4, 10.)  Therefore, neither Redman's nor Pennington's comments give rise to a plausible claim for Title VII relief.

29

### 2. No Inference of Discriminatory Intent from Complaints about Redman before December 16, 2020.

The third amended complaint alleged that between July and August 2020, Kennedy complained to Dunk "three or four times" about Redman's actions toward her. (Doc. 45 at 6.) However, these complaints were irrelevant to the no-contact order and shift change because Kennedy did not allege that she told anyone facts from which her supervisors may have concluded that Redman was engaged in race-based harassment. (Doc. 45 at 6.) Thus, there was no opportunity for Kennedy's supervisors to have engaged in race-based disparate treatment. These complaints, likewise, then did not state a plausible claim for Title VII relief.

### 3. No Inference of Discriminatory Intent from No-Contact Order and Shift Change After December 16, 2020 Incident.

The third amended complaint alleged that on December 16, 2020, while Kennedy had been in the commissary's administration office filling out paperwork, Redman approached Kennedy and snatched from her hand the key to the receiving office. (Doc. 45 at 7.) Afterward, Kennedy went to the receiving office to complete her paperwork. (Doc. 45 at 8.)

When Kennedy arrived at the receiving office, she saw Redman and, contrary to agency policy, started recording Redman with her cell phone. (Doc. 45 at 8, 12.)   During the recorded encounter, Redman accused Kennedy of calling her the n-word.  (Doc. 45 at 8.)  Kennedy denied the accusation.  (Doc. 45 at 8.)  The cell-phone recording did not capture Kennedy saying the n-word.  (Doc. 45 at 8-10.)  Afterward, Redman told the front-end manager, Hope Joseph, about what had happened between her and Kennedy including Kennedy having called her the n-word.  (Doc. 45 at 8-9.)  Joseph contacted the zone manager, who told Joseph to have all those involved submit statements.   (Doc. 45 at 9.)   Joseph also informed Kennedy's supervisors, Pennington and Dunk.  (Doc. 45 at 3, 9.)

In the following days, Kennedy twice met with her supervisors. (Doc. 45 at 9-10.)  In the first meeting, the supervisors declined Kennedy's offer to watch the cell phone recording.  (Doc. 45 at 9-10.)  However, the next day, at the instruction of someone from human resources, they watched the recording.  (Doc. 45 at 10.)  They did not hear Kennedy call Redman the n-word on the recording, but they determined that Kennedy

had harassed Redman.  (Doc. 45 at 9-10.)  On December 22, 2020, Pennington and Dunk issued Kennedy an order to have no contact with Redman.  (Doc. 45 at 10.)  And, Kennedy was moved from day shift to evening shift.  (Doc. 45 at 10.)  On February 26, 2021, Dunk and Pennington issued Kennedy a notice of proposed suspension for:  (1) calling Redman the n-word; (2) subjecting Redman to race-based harassment; and (3) violating DeCA policy for surreptitiously recording her co-worker.  (Doc. 45 at 12.)  Redman was not disciplined for the incident.  (Doc. 45 at 12.)

These facts do not lead to a plausible inference that racial discrimination occurred.  If anything, they suggest that the no-contact order and shift change were properly imposed to address:  (1) a complaint of an employee who was allegedly called a racial epithet; and (2) an admitted violation of agency policy.  *See Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (holding that courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer); *see also Stancombe v. New Process Steel LP*,

652 F. App'x 729, 737 (11th Cir. 2016) (holding employer responded appropriately to plaintiff's complaint of harassment by moving him to a different shift and ordering no contact with harasser).

Kennedy, however, claims that these facts were suggestive of discriminatory intent because the no-contact order and shift change were imposed against her, a Caucasian, even though Pennington and Dunk had: (1) ignored her complaints of generalized harassment by Redman, an African-American; and (2) not heard her call Redman the n-word on the cell phone recording. (Kennedy Br. 30-31.) Kennedy's claim is unavailing. First, as outlined above, none of the facts in the third amended complaint alleged that Redman's harassment was motivated by race. (Doc. 45 at 5-6.) Kennedy, on the other hand, was alleged to have called a co-worker a racial epithet and admitted she violated the agency's policy by creating a recording. (Doc. 45 at 7-9.) "Treating different cases differently is not discriminatory, let alone intentionally so." *Lewis v. City of Union City*, 918 F.3d 1213, 1222-23 (11th Cir. 2019). Second, even though Pennington and Dunk did not hear Kennedy call Redman the n-

33

word on the recording, this Court's decision in *Doe* illustrates that this fact is not sufficient to plausibly infer discriminatory intent.

In *Doe*, the plaintiff sued his university for finding him responsible for sexual assault and suspending him for five years.[3] *Doe*, 29 F.4th at 680-81. The plaintiff "had adequately alleged that he was innocent and wrongly found to have committed the offense." *Id*. at 685 (cleaned up). The district court dismissed the plaintiff's complaint, finding that he did not plausibly allege that his suspension was "on the basis of sex." *Id*. at 681. On appeal, the plaintiff argued that "discrimination on the basis of sex may be inferred from the arguably inexplicable outcome" of the university's decision. *Id*. at 690. This Court rejected the plaintiff's argument and affirmed the district court's dismissal, reasoning that other allegations established more likely explanations for the university's conduct, including "inexperience, ineptitude, and sex-neutral pro-complainant bias." *Id*. at 681, 692. The Court held that between those obvious alternative explanations for the university's conduct, and the

---

[3] The plaintiff brought suit under Title IX. *Doe*, 29 F.4th at 680-81.

34

purposeful, invidious discrimination the plaintiff asked it to infer, sex discrimination was not a plausible conclusion. *Id*. at 692.

So too, here, then, the absence of Kennedy's saying the n-word on the cell phone recording does not plausibly infer racially discriminatory intent. "After all, an employer can generally . . . discipline an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as that action is not for a discriminatory reason." *Tynes v. Fla. Dep't of Juv. Just*., 88 F.4th 939, 944 (11th Cir. 2023). And, "[a]lthough [Kennedy] consistently identified the race of her co-workers and supervisors in her [third] amended complaint, the mere fact that these individuals were [not Caucasian] did not plausibly show that [Kennedy] suffered any discrimination . . . on the basis of her race." *Arrington v. Ala. Power Co*., 769 F. App'x 741, 747 (11th Cir. 2019).

Moreover, Kennedy does not challenge the proposed suspension as an adverse employment action, (Kennedy Br. 30), but she claims that the "single legitimate ground" supporting it—that she surreptitiously recorded Redman in violation of the commissary's policy—was a pretext to infer that the otherwise discriminatory no-contact order and shift

change were legitimate.[4]  (Kennedy Br. 34-35.)  Kennedy fails to allege

sufficient facts from which pretext may be inferred.  A plaintiff can

demonstrate pretext by: (1) casting sufficient doubt on the defendant's

proffered nondiscriminatory reasons to permit a reasonable fact finder to

conclude that the employer's proffered reasons were not what actually

motivated its conduct; (2) showing that the employer's articulated reason

is false and that the false reason hid discrimination; or (3) establishing

that the employer has failed to clearly articulate and follow its formal

policies.  *Lewis v. City of Union City*, 934 F.3d 1169, 1186 (11th Cir. 2019).

The third amended complaint alleged no facts to support any of these

inferences.  Kennedy only makes the conclusory assertion that because

---

[4] To the extent Kennedy does challenge her proposed suspension as an
adverse employment action, her third amended complaint failed to state
a plausible claim for Title VII relief.  Typically, an adverse employment
action will affect continued employment or pay.  *Monaghan v. Worldpay
US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020).  Kennedy never served her
proposed suspension.  (Doc. 45 at 13-14.)  Therefore, it did not affect her
continued employment or pay to constitute an adverse employment
action.  *See Monaghan*, 955 F.3d at 860 (holding that an adverse
employment action includes a suspension if it is without pay); *see also
Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 588 n.15 (11th Cir. 2000)
(holding that a threatened adverse employment action does not
constitute an adverse employment action), *abrogated on other grounds by
Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

36

the cell phone recording did not show her calling Redman the n-word, Pennington and Dunk's motivations must have been discriminatory. (Kennedy Br. 34.)   This assertion is not enough to plead a plausible inference of discriminatory intent. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (holding that when allegations are more conclusory than factual, the court need not assume their truth in ruling on a motion to dismiss).

Therefore, the facts surrounding the December 16, 2020 incident between Kennedy and Redman, where Kennedy allegedly called Redman the n-word, and Kennedy's discipline for the incident were not sufficient to plausibly plead an inference of discriminatory intent.

Accordingly, Kennedy's third amended complaint failed to plead a plausible inference of discriminatory intent.   Because it failed to plead a plausible inference of discriminatory intent, the district court correctly dismissed it for failing to state a Title VII claim for relief.   The district court's judgment should be affirmed.

## CONCLUSION

For the reasons set out above, the Secretary respectfully requests this Court affirm the judgment of the district court.

JILL E. STEINBERG
UNITED STATES ATTORNEY

***/s/ Channell V. Singh***

Channell V. Singh
Assistant United States Attorney
Georgia Bar No. 216540
*channell.singh@usdoj.gov*

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 7,156 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief was filed today through this Court's ECF system, and thereby served on counsel of record for Jamie Kennedy, Scott G. Reddock and Katie R. Bates, at their Court-registered e-mail addresses, pursuant to Fed. R. App. P. 25(c)(1)(C) and 25(c)(2), and 11th Cir. R. 25-3(a).

This 6th day of November, 2024.

Respectfully submitted,

JILL E. STEINBERG
UNITED STATES ATTORNEY

*/s/ Channell V. Singh*

Channell V. Singh
Assistant United States Attorney
Georgia Bar No. 216540
*channell.singh@usdoj.gov*

39

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422